UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| v. ) | Case No. 1:23-cr-077 |
| ) | |
| KENNETH CHRISTIAN PAUL SCHULZ, ) | |
| ) | |
| DEFENDANT. ) | |
| _____ ) | |

**SENTENCING MEMORANDUM**

Defendant, Kenneth Schulz, by and through his attorney Matthew Campbell, Federal Public Defender, District of the Virgin Islands, submits this sentencing memorandum by which he respectfully requests that the Court sentence him to twenty-four months' probation and $500 restitution. That sentence is sufficient but not greater than necessary under 18 U.S.C. §3553(a) as discussed herein.

1. **Nature and Circumstances of the Offense (18 U.S.C. §3553(a)(1))**

The details of Kenneth Schulz's offense conduct are set forth more fully in the PSR (PSR at ¶¶7-19) and not fully recounted here. In assessing the nature and circumstances of the offense for purposes of sentencing Mr. Schulz, it is far more important for the Court to consider Mr. Schulz's actual participation in the offense (*see* PSR at ¶¶14-19) than it is to consider the actions of others (*see* PSR at ¶¶7-13). While Mr. Schulz does not dispute the accuracy of that description of conduct (*see* PSR at ¶¶7-13) the vast majority of people referred to therein were unknown to Mr. Schulz, and whom Mr. Schulz neither conspired with nor planned with. Moreover, some of the actions described therein (e.g., assaulting officers, breaking windows) are actions taken by others and not by Mr. Schulz. Thus, the section detailing Mr. Schulz's participation(*see* PSR at ¶¶14-19) is a far better

1

summary of the relevant circumstances of the offense for purposes of evaluating the section 3553(a) factors.

As detailed therein, Mr. Schulz knowingly entered and remained in the United States Capitol, a restricted building, without lawful authority to do so, for a period of approximately six minutes. He did so after attending an incendiary rally organized by then-President Donald Trump. Speakers at that rally included:

- Rep. Mo Brooks: "Today is the day American patriots start taking down names and kicking ass."
- Katrina Pierson: "Americans will stand up for themselves and protect their rights and they will demand that the politicians that we elect uphold those rights, or we will go after them."
- Amy Kremer: "Republicans for years have been afraid of their own shadow. They tuck tail and run any time they see their shadow." & "We are not going to back down. We're not going away."
- Georgia State Rep. Vernon Jones: "these demon Democrats."
- Texas Attorney General Ken Paxton: "If you look at what Georgia did, they capitulated. They consented. … We kept fighting in Texas."
- Eric Trump: "Have some backbone, show some fight, learn from Donald Trump. … He has more fight in him than every other one combined, and they need to stand up and we need to march on the Capitol today. And we need to stand up for this country and stand up for what's right."
- Kimberly Guilfoyle: "We will not allow the liberals and the Democrats to steal our dream or steal our election."

> ➢ Donald Trump Jr.: "You have an opportunity today: You can be a hero, or you can be a zero. And the choice is yours but we are all watching."
>
> ➢ Madison Cawthorn: "There is a significant portion of our party that says we should just sit idly by and sit on our hands. They have no backbone."
>
> ➢ John Eastman: "This is bigger than President Trump. It is the very essence of our Republican form of government and it has to be done."
>
> ➢ Rudy Giuliani: "If we're wrong, we will be made fools of. But if we're right, a lot of them will go to jail. So, let's have trial by combat."

The overarching theme of these incendiary speeches was the words were not good enough—everyone needed to take action! And if there was any doubt about that, former-President Trump removed it:

> ⁃ "And after this, we're going to walk down, and I'll be there with you, we're going to walk down, we're going to walk down."
>
> ⁃ "Because you'll never take back our country with weakness. You have to show strength and you have to be strong. We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated."
>
> ⁃ "And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore."
>
> ⁃ "So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania Avenue. And we're going to the Capitol, and we're going to try and give. … So let's walk down Pennsylvania Avenue."

Once again, the call made by former President Trump was one for action, with instructions to "go[] to the Capitol" and "fight like hell." And this call was made to an audience of 80,000 people, according to law enforcement.[1]

Admittedly, Mr. Schulz and everyone else who attended the January 6th rally were legally responsible for their own conduct that day. But to ignore the effect of the echo chamber that existed for the prior two months (*e.g.*, FoxNews, OAN, Breitbart, Infowars, etc.) that culminated in that January 6th rally is to ignore reality.[2] It is reasonable to conclude that but for the nonstop stream of lies bombarding people like Kenneth Schulz, in combination with the incendiary rhetoric calling them to action, Mr. Schulz and others like him would never have made the decision to enter the Capitol. As discussed herein, Mr. Schulz's history and characteristics indicate that this conduct is truly aberrant for him, and likely would not have occurred but for these unique circumstances.

So what did Kenneth Schulz do? After attending the rally, he decided to walk along with thousands of others[3] to the United States Capitol. Prior to entering the building, Schulz posted a picture to Facebook of a door with a shattered glass pane with the caption, "TAKE THE CAPITOL." He neither broke the window nor encouraged others to do so. At approximately 2:13 p.m., roughly 34 seconds after the first person breached the Senate Wing Doors, Mr. Schulz entered the Capitol building. While in the Capitol building, he posted a picture to Facebook of the interior

---

[1] *See* https://www.latimes.com/politics/story/2022-01-05/by-the-numbers-jan-6-anniversary (last accessed August 24, 2023).
[2] It is important to note that the election in November 2020, and the lead-up to the events of January 6th, occurred during the heights of the COVID pandemic and lockdown—a period of time when many Americans were isolated from personal interaction. Most socialization was limited to online or television—media which exacerbated the echo chamber effect since people would only be exposed to voices that they chose to hear, which meant that they were likely to only hear voices from one point of view.
[3] The psychological concept of "mob mentality" is well recognized. (*See, e.g.,* "What is Mob Mentality?, WebMD, available at https://www.webmd.com/mental-health/what-is-a-mob-mentality) (last accessed August 28, 2023). That Mr. Schulz and others may have acted differently as part of this crowd of thousands than they would have on their own is hardly surprising.

Capitol hallway with the caption, "STORMING THE CAPITOL." Schulz entered the Ohio Clock Corridor with a small group of people before being stopped by law enforcement, who instructed them to leave the Capitol. Schulz exited the Capitol through the Senate Carriage Door at approximately 2:19 p.m., roughly six minutes[4] after he entered.[5]

And what didn't Kenneth Schulz do? He did not engage in any acts of violence. He did not damage or take any property. He was not involved in planning or organizing any of the activities the crowd engaged in. He was not associated with any of the groups (e.g., Proud Boys, Oath Keepers, etc.) reported to have been instrumental in the events of January 6th.

In a subsequent interview with the FBI, Kenneth denied taking and/or posting such photos. Presumably, the government will argue that Mr. Schulz' posts, and the subsequent denial of the same, aggravates his offense. Any merit to that argument is minimal. The posting of photos did little

---

[4] Cases that involve short intrusions into the Capitol include *United States v. Sean Cordon*, No. 21-cr-269 where the defendant entered the Capitol for four minutes, and received a 45-day probationary sentence. Kevin Cordon, who was also in the Capitol for only four minutes but gave an international news interview after the intrusion, received twelve months' probation and a $4,000 fine. *United States v. Kevin Cordon*, No. 21-cr-277. Andrew Wrigley trespassed into the Capitol for one minute and received an 18-month probationary sentence. *United States v. Andrew Wrigley*, No. 21-cr-042-ABJ.

[5] Other defendants who remained in the Capitol building for significantly longer periods of time received probationary sentences without home confinement:
   a. Danielle Doyle received probation only (no home detention) and was inside from approximately 2:23 to 2:48 pm, including being inside while the secondary breaches (of offices and the Senate Chamber) and shooting were happening, and after climbing through a broken window (1:21-CR-00324-TNM).
   b. Eliel Rosa received probation (no home detention) and was inside from 2:35 to 2:54 pm, including being inside while the secondary breaches and shooting were happening (1:21-CR-00068-TNM).
   c. Lori and Thomas Vinson also received probation (no home detention) and were inside from approximately 2:18 until 2:50 pm, including being inside while the secondary breaches and shooting were on-going (1:21-CR-00355-RBW).
   d. Thomas Gallgher also received probation (no home detention) and did not leave voluntarily-- Mr. Gallgher was tackled and arrested after about 10 minutes (1:21-CR-00041-CJN).
   e. Jennifer Parks received a probationary sentence of 24 months after being in the Capitol for approximately 15 minutes (1:21-CR-363-CJN).

All the images of rioters in tactical gear with zip ties on the Senate floor, or rummaging through offices and desks, happened after Mr. Schulz had already exited the Capitol.

to aggravate the offense. Mr. Schulz did not post anything on social media in an effort to create a conspiracy, or encourage others to engage in criminal conduct they otherwise would not have engaged in. Instead, the photos taken simply documented an ongoing event. Had Mr. Schulz shoplifted a six-pack of beer, would that offense have been more aggravated if he took a selfie of himself walking with the six-pack? If anything, his posts were counterproductive, as they made it easier for law enforcement to identify him as a perpetrator and track him down.

Mr. Schulz did initially deny posting any photos on January 6th when he was interviewed by law enforcement two-and-one-half months later. But taken in context, these statements do not meaningfully aggravate the offense.[6] These statements were made in the context of an interview in which he admitted attending the rally, walking to the Capitol, entering the Capitol and remaining inside for approximately five minutes. Thus, he did not claim that he wasn't there, or that he didn't enter the Capitol, or only did so under duress. It is possible that due to the chaotic environment and likely rush of adrenaline, he forgot that he made the two posts cited. Or perhaps he was embarrassed by his posts. While admittedly it would have been better to provide fully accurate details, his initial statement that he didn't post any photos of the Capitol did not obstruct justice, nor were they an attempt to create a defense to any crime.[7]

---

[6] Engaging in limited posting of photographs at the Capitol is hardly unique, nor does it meaningfully distinguish Mr. Schulz from others receiving probationary sentences. For example, John Wilkerson IV, on the evening of January 6, Mr. Wilkerson posted videos and one picture on snapchat of himself with others along with text, which the F.B.I. paraphrased as saying: "today was a good day, we got inside the Capitol." Mr. Wilkerson ultimately received a 36-month probationary sentence without any condition of home confinement. (1:21-CR-00302-CRC).

[7] Other defendants who have posted far more inflammatory messages have nonetheless received probationary sentences. In *United States v. Bustle*, No. 21-cr-00238-TFH, Ms. Bustle received a sentence of 24-months' probation notwithstanding Ms. Bustle's social media postings:
Before traveling to the Capitol, [Ms. Bustle] posted a message that read, in part, "We don't win this thing sitting on the sidelines. Excited to stand for truth with my fellow patriots and freedom fighters in D.C. today." During or after the riot, she posted a message that read, in part, "Pence is a traitor. We stormed the capital [sic]. An unarmed peaceful woman down the hall from us was shot in the neck by cops. It's insane here." In another message, apparently written after the riot, she wrote "We

It is important to note that Mr. Schulz had no intention of storming the United States Capitol when he traveled to the Donald Trump rally on January 6th, 2021. Nor did he intend to storm the Capitol as the massive crowd walked down Pennsylvania Avenue. However, he does not dispute in the slightest that he unlawfully entered the Capitol and does not diminish the damage done that day, not only to property but to every life affected as a result directly and indirectly. Mr. Schulz agrees that "there were no tourists" inside the Capitol on that day. He does not now diminish the enormity of the events of January 6th nor his participation. He simply wishes to take responsibility for his actions and move forward with his life.

Compared to many defendants charged with January 6th offenses, Kenneth Schulz's conduct was far more limited. Mr. Schulz entered the United States Capitol along with a crowd. He did not assault law enforcement officers or anyone else. He did not break any windows or doors upon entry to the Capitol, nor did he engage in any efforts to damage property within the Capitol Building. He did not attempt to 'break in' to any offices or other secured areas. Mr. Schulz was stopped by law enforcement and asked to leave. And Mr. Schulz did exactly that. He was inside the Capitol Building for approximately six minutes and left when asked to do so. No force or other harsh measures were necessary to convince Mr. Schulz to leave, as he readily complied with a directive from law enforcement.

2. **History and Characteristics of Kenneth Schulz (18 U.S.C. §3553(a)(1))**

Kenneth Christian Paul Schulz was born on August 21, 1991, in Highland Park, Illinois, to the marital union of Richard Schulz (*deceased*) and Adriana Schulz. His mother now lives in Illinois and is employed with a home development company. His brothers, Richard Schulz, II and Eric

---

need a Revolution! We can accept an honest and fair election but this is NOT fair and patriots don't want to see their country brought into communism and destroyed over a lie."
*Bustle* Statement of Offense (ECF 25) at 4; Judgment (ECF 42).

7

Schulz. live in Illinois and are employed with a home development company and delivery company, respectively. Kenneth shares close relationships with his mother and brothers. Kenneth was estranged from his father, as they had a "falling out" when the he was younger and never reconnected. During his upbringing, his father was "an absent father that sometimes randomly showed up."

Kenneth did not have "the best upbringing." His parents separated when he was 3-4 years old. Thereafter, Kenneth and his brothers were raised by their mother and ex-stepfather, Kim Rogalin, in the same household from approximately 2010-2015. Mr. Rogalin was strict, rough, and tough. For example, in response to failing to complete a chore, Mr. Rogalin dumped trash on Kenneth's bed. Once when Mr. Rogalin and Kenneth's mother were arguing, Mr. Rogalin pushed his mother. His mother remained in the home until she was able to secure her own residence. In the interim, Kenneth lived with his maternal aunt, Lily Martinez. Kenneth's basic needs were met, as his mother worked hard to provide for the defendant and his siblings. However, this resulted in his mother being away from the home often. There were no known instances of drug use, alcohol abuse, or physical/sexual abuse within the household. Kenneth was not involved in extracurricular activities, as the family could not afford them.

Kenneth's day-to-day life while growing up was traumatic. This resulted in him leaving his mother's residence at age seventeen and moving in with friends. He also started working to support himself. At age twenty-two, he was involved in a vehicular accident which resulted in the car being totaled. While he did not sustain any physical injuries, the experience was mentally traumatic. He used his entire wages to resolve the situation, and Kim Rogalin, his ex-stepfather, sued him. Kenneth experienced a high degree of stress and felt like he was "spinning wheels" trying to resolve the situation.

Kenneth earned a high school diploma in 2010 from Harry D. Jacobs High School in Brookwood, Illinois. Thereafter, he attended DeVry University – Addison Campus and earned an Associate of Applied Science in Information Technology and Networking in 2020.

Kenneth lived in Illinois until age twenty when he relocated to Texas. After living in Texas for five years, he moved to Florida and has since lived there.

Kenneth is skilled in information technology and software programming. He has been employed with Ramquest, Inc., since July 17, 2017, as a software test analyst earning $26.04 hourly. Prior to working at Ramquest, Inc., he was employed in product support with the Follett Higher Education Group and as a Geek Squad associate with Best Buy. Prior to those jobs, he always maintained stable employment.

3. **Seriousness of the Offense, Promotion of Respect for the Law, and Just Punishment (18 U.S.C. §3553(a)(2)(A))**

Kenneth Schulz stands convicted of a Class B misdemeanor. The maximum term of imprisonment for that offense is six months' incarceration. (PSR at ¶61). The United States Sentencing Guidelines do not apply (PSR at ¶62) and thus any sentence from 0-6 months is permissible. The requested sentence is appropriate in light of the seriousness of the offense.

The requested sentence promotes respect for the law. Mr. Schulz now stands convicted of a federal offense. Moreover, he stands convicted of a *notorious* federal offense—namely, participating in the events of January 6th. The collateral consequences of his conviction for that offense will follow him for some time. He was initially arrested on March 10, 2023, and has been subject to Court supervision since that time. Should he be sentenced to twenty-four months supervision, the net effect will be that he has been subject to the criminal justice system for thirty months. That length of supervision promotes respect for the law, considering the brief duration (six minutes) of the misdemeanor he stands convicted of.

For these same reasons, a twenty-four-month term of probation combined with $500 restitution award provide just punishment. That probationary term has the Damoclean psychological effect of instilling fear that incarcerative punishment is but one bad choice away. While admittedly not as punitive as incarceration, the duties and obligations imposed by the supervision process—duties and obligations which other citizens lack—also have a punitive effect. Indeed, as set forth in *Gall v. United States*, probation (or post-release supervision), "rather than an act of leniency, is a substantial restriction of freedom." 552 U.S. 38, 44 (2007) (internal quotation marks omitted). The *Gall* Court emphasized that the defendant would have to "comply with strict reporting conditions." *Id.* The Court also noted that the defendant would "not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court." *Id.*

4. **Deterrence (18 U.S.C. §3553(a)(2)(B))**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

Specific deterrence is obtained for the defendant by the prosecution and conviction itself. The personal and reputational consequences the Mr. Schulz has suffered are more than sufficient to discourage him from engaging in similar conduct. He recognizes that he did wrong and has not repeated that type of conduct in the last two-plus years. He pled guilty and accepted responsibility for his conduct. He has dedicated himself to furthering his career while avoiding these types of entanglements. A non-incarcerative sentence of probation, along with $500 restitution award, is sufficient punishment to provide for specific deterrence.

As for general deterrence, several observations can be made. First, the prosecution itself (and the publicity of conviction) all serve as a significant general deterrence. *See, e.g. Wayte v. United States*,

10

470 U.S. 598, 607 (1985) (observing that any prosecution has a "general deterrence value"); *United States v. Gamarra*, 940 F.3d 1315, 1321 (D.C. Cir. 2019) (observing that prosecution itself provides general deterrence). If that is true generally, it is especially true here. The requested sentence is also sufficient for purposes of general deterrence. The Court has made it clear to the public at large that conduct of this type will not be tolerated. Many, many defendants have already been convicted and sentenced. The certainty of conviction for this type of conduct provides sufficient general deterrence.

Unlike almost any other federal misdemeanor charge (besides other Defendants in January 6th cases), no one in their right mind would expose themselves to the level of vitriol that the media has heaped upon all January 6th Defendants—regardless of the level of their participation or the severity of their particular charges. The publicity involved in these cases is itself providing significant general deterrence unlike any run of the mill federal misdemeanor case. It might also be observed that internet articles on this matter will last in perpetuity. January 6, 2021 will be a day that lives in infamy, and, for those who entered the Capitol it will be a lifelong stain on their names.

5. **Protection of the Public from Further Crimes of Kenneth Schulz (18 U.S.C. §3553(a)(2)(C))**

Mr. Schulz was previously convicted of a misdemeanor count of Criminal Damage to Property Not Exceeding $300. He served twelve months' probation and did thirty hours of community service. (PSR at ¶25). He now stands convicted of another misdemeanor. Neither of his offense were violent, nor was either a felony. The circumstances leading to the instant offense were unquestionably unique and unlikely to repeat. Mr. Schulz has certainly learned a valuable and would not make the same decisions again. The public needs no protection from Kenneth Schulz.

6. **Providing Mr. Schulz with Needed Training, Care or Treatment (18 U.S.C. §3553(a)(2)(D))**

Any treatment needs can be accomplished via a probationary sentence. Mr. Schulz was diagnosed with depression and ADHD and manages those conditions with psychotropic

medication. He had general thoughts of suicide without a plan for 3-4 years. Further, he was depressed for 5-10 years before being formally diagnosed with depression and attention deficit hyperactivity disorder (ADHD) approximately 4-5 years ago when he was finally able to afford to see a physician. He was prescribed Sertraline, an antidepressant. He used that medicine for approximately three years until he felt fine without it. Mr. Schulz has been under the care of a general physician, for the past five months and uses Lorazepam (*10 mg*) once daily as needed for insomnia. Additionally, he uses Vyvanse (*20 mg*) daily to manage ADHD related symptoms. He has no family history of mental illness and does not believe he needs formal mental health treatment at this time.

Mr. Schulz disclosed having been introduced to marijuana in 2012 at a party. Thereafter, he used the substance socially until 2015 when he started smoking marijuana daily. He ceased using marijuana in 2016, as he did not like the effects of the substance on his body. Further, he was beginning to miss appointments and show up late for work. He first tried alcohol at age twenty-one at a party. He sometimes drank to excess and experienced an alcohol-induced blackout once. HE has not used alcohol to excess in more than five years, as his social circle changed, and he no longer has the desire to do so.

Any mental health or substance treatment the Court felt necessary could be accomplished as part of a probationary sentence.

7. **Avoiding Unwarranted Disparities (18 U.S.C. §3553(a)(6))**

Mr. Schulz is charged with one count of a Class B misdemeanor related to his trespass in a federal building. Standing alone, and given his history and characteristics, such a conviction would usually result in a sentence not involving active incarceration. However, Mr. Schulz agrees that the events on January 6th are of a different nature than an ordinary trespass to federal property. Hundreds of individuals, if not more, trespassed on Capitol grounds after attending the "Stop the Steal" rally.

Many engaged in violent conduct; many others did not. Some entered the Capitol building itself; others did not. Some violated the Senate floor, the House floor and/or offices of lawmakers; others did not. The actions of the whole are to be condemned in the strongest terms. However, the repercussions for individual defendants should reflect their particular participation, their individual backgrounds, their intent at the time of the offense and their actions following the offense (i.e., acceptance of responsibility or braggadocio)

Kenneth Schulz stands convicted of one count of Parading, Demonstrating, or Picketing in a Capitol Building pursuant to 40 U.S.C. §5104(e)(2)(G). As set forth herein, this behavior is truly aberrant in the context of his entire life. He is not the first such defendant to be sentenced in this District for a violation of that statute on January 6th. A summary of defendants who have been sentenced for violations of 40 U.S.C. §5104(e)(2)(G) is attached (*see* Attachment A). A review of those cases shows the following:

- ❖ There are 306 cases of defendants sentenced for violations of 40 U.S.C. §5104(e)(2)(G);
- ❖ There are 110 cases in which the defendant received a probationary sentence without any form of confinement (36 percent of cases);
- ❖ In 78 cases, the defendant was sentenced to a probationary sentence with a condition imposing a period of home confinement (25 percent of cases);
- ❖ In 17 cases, the defendant was sentenced to a period of intermittent incarceration (5 percent of cases); and
- ❖ In 101 cases, the defendant was sentenced to a period of incarceration (other than intermittent confinement)(33 percent of cases).[8]

---

[8] In considering this group of cases, it is important to consider the future effect of the Court of Appeals' recent decision in *United States v. James* Little, Case No. 22-3018, (D.C.Cir. August 18, 2023)

In 61 percent of the cases, defendants received a probationary sentence (the majority of which did not include home confinement) without a sentence of incarceration. Sentencing Mr. Schulz to a probationary sentence without home confinement would not create any sentencing disparity—nor would including a period of home confinement.[9] Including a period of incarceration—whether intermittent[10] or otherwise—would place Mr. Schulz in the minority of defendants who received a more severe sentence.[11] Based on the facts and circumstances documented herein and in the PSR, Mr. Schulz submits that the section 3553(a) factors do not support placing him in the minority of defendants receiving incarcerative sentences. In other words, an incarcerative sentence for Mr. Schulz would create sentencing disparity compared with other similarly situated defendants, and is greater than necessary under 18 U.S.C. §3553(a).

---

in which the District of Columbia Circuit Court of Appeals held—in a 40 U.S.C. § 5104(e)(2)(G) case—that the sentencing Court could not impose a sentence of both incarceration and probation. It appears that at least half of the cases in which incarceration was imposed included a term of supervision thereafter. If fifty or more of those sentences are invalid, then the percentage of cases in which incarceration was properly imposed decreases rapidly, while the percentage of cases in which probation or probation with home confinement increase significantly.

[9] Mr. Schulz notes that cases with home detention as a special condition of probation generally seem to have had additional aggravating factors. *See, e.g., United States v. Bennett*, 21-cr-227 (defendant convicted of disorderly conduct while wearing a Proud Boys hat received two years' probation, three months' home confinement, and 80 hours community service); *United States v. Griffin*, 21-cr-92 (defendant who created a Trump-as-shooter video game received 36 months' probation with 90 days' home confinement); *United States v. Dillon*, 21-cr-360 (defendant who planned her trip weeks in advance and was shown on video to have been fighting hard to get into the Capitol received three years' probation with two months' home detention).

[10] While Mr. Schulz adamantly asserts that any sentence of incarceration is greater than necessary pursuant to section 3553(a), assuming *arguendo* that incarceration is called for, he asserts that intermittent confinement would be appropriate in order to allow him to continue his employment.

[11] Sentences of incarceration have generally reflected more extreme aggravating factors. *See, e.g., United States v. Crurzio,* 21-cr-41 (six months' incarceration for defendant with prior record who refused to leave Capitol after being ordered to do so by police); 21-cr-148 (defendant who advanced to the door of Speaker Pelosi's office sentenced to 45 days' incarceration); *United States v. Reeder*, 21-cr-166 (defendant shown on video to have grabbed and pushed a police officer to the ground received 3 months' imprisonment); *United States v. Ryan*, 21-cr-50 (defendant who traveled to Washington on a private jet and did multiple social media postings, including tweeting that she would not go to jail because she had "blonde hair and white skin," sentenced to 60 days' incarceration).

8. **Providing Restitution (18 U.S.C. §3553(a)(7)**

Kenneth Schulz has agreed to pay restitution in the amount of $500 to the Architect of the Capitol as a condition of his plea and sentence in this case. A non-incarcerative sentence which allows him to continue to work will facilitate Mr. Schulz's ability to pay this restitution amount expeditiously.

**Conclusion**

Kenneth Schulz's trespassing in the Capitol on January 6, 2021was not a planned event—instead, it was a spontaneous act that only occurred after the incendiary rally and mass march to the Capitol along with thousands of others. Most importantly, Mr. Schulz has learned much since that day, and has been deterred from engaging in similar conduct in the future.

For all these reasons, a sentence of twenty-four months' probation and $500 restitution is sufficient but not greater than necessary under all of the section 3553(a) factors.

Dated: August 29, 2023

          Respectfully submitted,

          *s/Matthew Campbell*
          MATTHEW CAMPBELL, ESQ.
          Federal Public Defender
          District of the Virgin Islands
          1336 Beltjen Road, Suite 202
          St. Thomas, VI 00802
          Tel (340) 774-4449
          Fax (340) 776-7683
          E-mail: matt_campbell@fd.org